IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

ERNEST. A. J.,                          §
                                        §
                Plaintiff,              §
                                        §
v.                                      §          Civil Action No. 1:18-CV-00194-BU
                                        §
ANDREW M. SAUL,                         §
Commissioner of Social Security,        §
                                        §
                Defendant.              §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF
THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff Ernest A. J.[1] seeks judicial review of a final decision by the Commissioner of

Social Security ("Commissioner") denying his application for disability and disability insurance

benefits.  Pursuant to the provisions of 28 U.S.C. § 636(b) and Special Order 3-326, this case was

reassigned to the undersigned magistrate judge on October 1, 2019.  Dkt. No. 17.  For the reasons

that follow, the undersigned recommends that the Commissioner's decision be AFFIRMED.

I.          BACKGROUND

Plaintiff appealed to this Court under 42 U.S.C. § 405(g) after his claims were denied at

the administrative level.  Plaintiff applied for a period of disability and disability insurance benefits

on December 7, 2015, alleging a disability onset date of July 1, 2013.  Dkt. No. 14 at 3.  Plaintiff

alleged symptoms of depression, anxiety, anger, and suicidal ideation.  Dkt. No. 15 at 2; Tr. 188.

On April 6, 2016, the Commissioner denied his claims on initial consideration.  Tr. 83–87.

Plaintiff requested reconsideration on June 1, 2016, and the Commissioner again denied his claims

on July 13, 2016.  Tr. 90, 91–96.

---

[1] Due to concerns regarding the privacy of sensitive personal information available to the public through opinions in
Social Security cases, Plaintiff is identified only by first name and last initial.

Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 97–98.  A video teleconference hearing took place on July 17, 2017.  Tr. 31–59.  During the video hearing, the ALJ presided from Fort Worth, Texas, and Plaintiff, represented by counsel, appeared and testified from Midland, Texas.  Tr. 33.  A vocational expert ("VE") was present in Fort Worth with the ALJ and also testified at the hearing.  *Id*.

A.  <u>Factual Background</u>

At the time of the hearing, Plaintiff was 39 years old.  Tr. 154.  He has a high school education, two years of college education, no specialized training, can communicate in English, and his past work experience includes work as a delivery truck driver, derrick worker, roustabout, and shop helper.  Dkt. No. 14 at 3; Tr. 35, 56.

1.  <u>Medical Evidence</u>

Plaintiff was hospitalized eight times for suicidal ideation between 2011 and 2015.  Tr. 53–55.  The medical evidence within the administrative record specifically includes records from Plaintiff's hospitalizations at Acadia Abilene LLC in 2011 and River Crest Hospital in 2015.  *See* Tr. 248–264 (Acadia Abilene LLC inpatient records); Tr. 265–271, 317–327 (River Crest Hospital inpatient records).  In February 2011, before the alleged onset date of disability, Plaintiff was hospitalized at Acadia Abilene LLC for suicidal ideation, where Plaintiff reported that he felt more depressed and could not function, particularly in a work setting.  Dkt. No. 14 at 2; Tr. 261.  Plaintiff received a diagnosis of major depressive disorder ("MDD"), recurrent, attention deficit hyperactivity disorder ("ADHD"), and adjustment disorder.  Tr. 253.  Plaintiff's Global

Assessment Functioning ("GAF") score was 35 on admittance and 75 upon discharge.[2]  Dkt. No. 14 at 2; Tr. 21.

In May 2015, Plaintiff reported to his primary care physician, Dr. George Lindsay, DO, that he had been without his Adderall, Lexapro, and Seroquel prescriptions for depression and anxiety for several months.  Dkt. No 14 at 4; Tr. 21.  Plaintiff expressed suicidal ideation with a plan.  Tr. 21.  On the advice of Dr. Lindsay, Plaintiff was  hospitalized at River Crest Hospital for alleged suicidal ideation in 2015.  Tr. 53.  Plaintiff had a GAF score of 20 on admission, and his final discharge diagnosis was MDD and a GAF score of 65.  Tr. 21, 270.

On August 10, 2015, Plaintiff began therapy with Dr. Samuel Brinkman, Ph.D.  Tr. 22–24. Dr. Brinkman's initial neuropsychological consultation found Plaintiff to have "severe levels of depression and anxiety" along with "a great deal of cognitive disorganization, resulting in distractibility, difficulty maintaining train of thought, and at times poor judgment."[3]  Tr. 308–09. During the initial consultation, Plaintiff maintained flat affect with depressed mood, displayed minimal eye contact, and was fidgety.  Tr. 351.  However, Dr. Brinkman observed that Plaintiff was alert and oriented to person, place, time, and situation, had normal recent and remote memory, coherent speech with appropriate prosody, and good judgment and insight.  *Id.*

Dr. Brinkman's initial evaluation concluded that

[Plaintiff] has excellent intellectual functioning. This was appropriately reflected in normal to high normal levels of development of academic skills and above average language abilities. Processing skills, perceptual-motor skills, and executive functioning are normal.

---

[2] "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001) (quoting AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)).

[3] At the initial consultation, Dr. Brinkman also noted Plaintiff's report that he has experienced lifelong attention and concentration problems; has noticed a change in his ability to remember names and appointments, express himself with words, understand what others are saying to him, and recall information for short periods of time; experiences general confusion, decreased focus and concentration, and some difficulty managing his finances and hygiene; and that he misplaces his personal items often, has difficulty with maintaining organization, and is frustrated by his poor focus and concentration.  Tr. 309.

> Memory and learning abilities are normal for verbal information and above normal for visual information. The most significant findings are marked disruptions to attention systems and severe levels of depression and anxiety. This combination has very apparently adversely affected his daily functioning.

Tr. 348.

Dr. Brinkman diagnosed Plaintiff with ADHD and MDD. *Id*. Dr. Brinkman recommended a treatment plan involving individual psychotherapy and medicinal management. *Id*. Plaintiff continued to meet with Dr. Brinkman on a monthly basis, including twice a month at times. Tr. 22–23.

On May 24, 2016, Dr. Brinkman completed a medical source statement regarding Plaintiff's symptoms, general limitations caused by his psychiatric condition, and work limitations related to his psychiatric state. Tr. 313–15. This questionnaire was styled as a "check-the-box" assessment and Dr. Brinkman left the "Comment" section blank. Tr. 315. Dr. Brinkman found Plaintiff to be "markedly impaired" or "extremely impaired" in several functional categories.[4] Dr. Brinkman also found Plaintiff to be "moderately impaired" in his ability to understand and remember short and simple instructions and carry out very short and simple instructions. Tr. 316.

Additionally, Dr. Brinkman completed another "check-the-box" form indicating the presence of at least four symptoms typical of depressive syndrome as defined by Appendix 1 Listing 12.04. Tr. 316. There, Dr. Brinkman found that Plaintiff exhibited symptoms of

---

[4] Dr. Brinkman noted that Plaintiff was "markedly impaired" in several categories, including his ability to remember locations and work-like procedures; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. Tr. 314–315. Finally, Dr. Brinkman concluded that Plaintiff was "extremely impaired" with respect to his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with and proximity with others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; and to accept instructions and respond appropriately to criticism from supervisors. Tr. 314.

anhedonia, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. *Id.*

Dr. Brinkman continued to treat Plaintiff from August 2015 until December 2016, when Plaintiff discontinued his treatment with Dr. Brinkman because of the cost of Plaintiff's insurance policy. Tr. 23, 328. After discontinuing treatment with Dr. Brinkman, Plaintiff began treatment with West Texas Center MHMR ("MHMR") beginning in December 2016 and continuing through at least June 2017. Tr. 23, 352–511, 512–671. An intake evaluation of Plaintiff performed on December 19, 2016, identified symptoms of isolation, avoidance of social situations, difficulty with concentration, depressed mood, crying spells, and "many of the same symptoms previously diagnosed." Tr. 403. Dr. Pugh, a psychiatrist at MHMR, performed a psychiatric evaluation of Plaintiff on December 30, 2016, observing Plaintiff to have a restricted affect, no suicidal ideation, limited judgment and insight, with intact concentration, attention, and memory. Tr. 23, 416–418. Dr. Pugh diagnosed Plaintiff with MDD, recurrent and severe, panic disorder, generalized anxiety disorder, and ADHD by history. Tr. 23. Dr. Pugh continued Plaintiff on Seroquel and Lexapro, and instructed him to return in four weeks. *Id.*

On January 26, 2017, Dr. Pugh observed Plaintiff's mood as euthymic with congruent affect, fair insight and judgment, and intact attention. Tr. 23. Plaintiff reported that his medicine appeared to help control his depression. Tr. 23, 580. Dr. Pugh assessed Plaintiff's GAF score at 48 and continued Plaintiff on Lexapro and Seroquel. Tr. 23, 583.

On March 23, 2017, Plaintiff again reported that his medicine was partially helpful to control his depression. Tr. 23, 597. Plaintiff's mental examination remained the same and there was no change in his GAF score. Tr. 23. A licensed vocational nurse at MHMR noted Plaintiff's mood and affect as anxious with poor contact, but noted no issues in attention, concentration,

judgment, or insight.  Tr. 23, 649.  While Plaintiff received treatment for his anxiety and depression, the record indicates that MHMR did not offer him treatment for symptoms arising from his ADHD.  Tr. 577 (Dr. Pugh noting that Plaintiff was "under the impression that he would get ADD/ADHD treatment" at MHMR, and that Plaintiff was "not happy" when informed he would need to seek treatment for ADHD from a medical specialist elsewhere); Tr. 624 (Dr. Pugh explaining to Plaintiff again the need to seek care from a medical specialist regarding his ADHD).

On May 18, 2017, Plaintiff informed Dr. Pugh that he "had an interest in doing such things such as watching television and the NFL draft, and that he was working on his mom's driving range."[5]  Tr. 23, 620.  Plaintiff's mental examinations revealed no abnormalities, and the attending nurse observed Plaintiff with flat affect and congruent mood.  Tr. 23, 663.

The medical evidence of record also includes the opinions of two State Agency Medical Consultants ("SAMCs"), Dr. Mark Schade, Ph.D, and Dr. Kevin Donovan, Ph.D.  Tr. 60–69 (Dr. Schade's disability determination on initial consideration); Tr. 71–81 (Dr. Donovan's disability determination on reconsideration).  The SAMCs did not examine Plaintiff personally, but rather reviewed the objective medical evidence, considered Plaintiff's allegations, and determined whether he qualified as disabled under the Act.  Tr. 62, 74.

On initial consideration, Dr. Schade opined that "claimant is somewhat limited by residual psychiatric symptoms, but these do not wholly compromise the ability to function independently, appropriately and effectively on a sustained basis." Tr. 64.  Dr. Schade determined that Plaintiff's statements regarding his symptoms were only "partially consistent" with the medical evidence of

---

[5] The medical treatment records from MHMR, the ALJ's unfavorable decision, and the Commissioner's brief each refer to the fact that Plaintiff worked on his mother's driving range.  Tr. 23, 620; Dkt. No. 15 at 4.  Counsel for Plaintiff, through a footnote in his reply brief, informs the Court that "[u]ndersigned counsel has been advised by Plaintiff's mother that . . . the family has never owned or operated a driving range."  Dkt. No. 16 at 3, n. 1.  Despite this potential mistake of fact, the undersigned finds that the ALJ's disability determination is nevertheless supported by substantial evidence.  Notably, Plaintiff advances no argument anywhere in his briefing that this mistake of fact adversely impacted the ALJ's ultimate conclusion.

record, concluding that Plaintiff was not disabled under the Act because he could perform his past relevant work as well as other available work. Tr. 65–69; Tr. 70 (Dr. Schade's disability determination dated April 5, 2016). Dr. Donovan examined Plaintiff's medical file on reconsideration and concurred with Dr. Schade's finding of non-disability as written. Tr. 78; Tr. 82 (Dr. Donovan's disability determination dated July 13, 2016).

    2. <u>Plaintiff's Testimony</u>

At the hearing, Plaintiff testified that he stopped working in June 2013 and has not sought employment since that time. Tr. 37–38. Plaintiff's daily activities include watching old movies, taking out the trash, keeping water fountains full, and bringing in the groceries. Tr. 42. Plaintiff stated that he does not like to go outside, but likes to keep the window open in the bathroom and look outside while keeping the lights off. *Id.* Plaintiff testified that he has a driver's license, but never drives. *Id.*

Plaintiff testified that he cannot work because he becomes "irrational," cannot get things done, works too slowly, cannot focus, cannot complete tasks, and has a "bad disposition" when interacting with others, which includes anger and outbursts. Dkt. No. 14 at 7; Tr. 39. Plaintiff argued with co-workers, supervisors, and customers throughout his previous jobs, including a physical altercation with a co-worker at one job. Tr. 45–46. He recounted that he often felt "lost" trying to perform work, could not complete tasks, and frequently forgot day-to-day instructions, which would in turn lead to anger, "including episodes where he would just walk off the job." Dkt. No. 14 at 7; *Id.* at 45–47.

Plaintiff also testified that he would have disagreements with co-workers over how work should be performed, noting that he had to do things a certain way so he could remember how to

perform the task.  Tr. 50.  He testified that he was doing work for his father for some time, but that his father stopped giving him work to do in 2013.  Tr. 51.

### 3.  VE Testimony

At the outset of her testimony, the VE classified Plaintiff's past work to include jobs as a truck driver, derrick worker, roustabout, and a shop helper.  Tr. 56.  The ALJ asked the VE whether an individual of Plaintiff's age, a younger individual with a twelfth grade education, would be capable of performing the past jobs described by the VE with the following non-exertional limitations: limited to performing simple, routine tasks, limited to making simple work related decisions, and have only occasional contact with supervisors and co-workers, but no contact with the public.  Tr. 57.

The VE concluded that the hypothetical individual could perform work as a shop helper, both as actually performed and as defined by the *Dictionary of Occupational Titles*.  *Id*.  The VE also testified that the hypothetical individual could perform other unskilled jobs available in the national economy such as machine package sealer, floor waxer, and box vender.  Tr. 57–58.

The ALJ presented the VE with a modified hypothetical to include an individual with the same mental limitations as mentioned above, but with the additional limitation that the individual would be off task fifteen percent or more during an eight-hour workday.  Tr. 58.  The VE testified that such a hypothetical individual could not perform their past work or any other work given the level of off-task behavior.  *Id*.  Plaintiff's attorney at the hearing did not ask any follow-up questions or cross-examine the VE.

## B.  ALJ's Findings

The ALJ's decision followed the five step sequential process provided by 20 C.F.R. § 416.920(a)(4).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful

activity since July 1, 2013.  Tr. 17–18.  At step two, he found that Plaintiff had the severe impairments of depression, anxiety, and ADHD, but that Plaintiff's obstructive sleep apnea was a non-severe impairment.  *Id.*  At step three, the ALJ found Plaintiff to have a marked limitation in interacting with others, and moderate limitations in understanding, remembering, or applying information; in concentrating, persisting, or maintaining pace; and in adapting or managing oneself.  Tr. 18.

Before proceeding to step four, the ALJ concluded that Plaintiff had no impairment or combination of impairments that satisfied the severity criteria of any listed impairment in 20 CFR 404, Subpart P, Appendix 1.  *Id.*  Thus, the ALJ performed a residual functional capacity ("RFC") assessment.  *See* 20 C.F.R. § 416.920a(d)(3).  In making his RFC determination, the ALJ found Plaintiff had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to perform simple, routine tasks; limited to simple work-related decisions; the claimant can have with occasional contact with supervisors and co-workers, but no contact with the general public.  Tr. 19.

Relying on the testimony of the VE at step four, the ALJ determined that Plaintiff could perform his past relevant work as a shop helper. Tr. 24.  Alternatively, at step five, the ALJ found that Plaintiff was capable of performing other work that existed in the national economy, such as machine package sealer, floor waxer, and box vender. Tr. 25.

The ALJ issued an unfavorable decision on November 8, 2017.  Tr. 12–30.  The Appeals Council denied review on October 5, 2018.  Tr. 1–6.  Therefore, the ALJ's decision is the final decision of the Commissioner and is properly before this Court for review.  *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005) ("[T]he Commissioner's final decision necessarily includes an Appeals Council's denial of a claimant's request for review.").

## II.  LEGAL STANDARDS

Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied to evaluate the evidence.  *See* 42 U.S.C. § 405(g); *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).

Substantial evidence means more than a scintilla, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence is "such relevant evidence as a responsible mind might accept to support a conclusion."  *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000).  While a reviewing court must scrutinize the administrative record to ascertain whether substantial evidence supports the Commissioner's findings, it may not reweigh the evidence, try issues *de novo*, or substitute its own judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988).  "If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive and the Commissioner's decision must be affirmed."  *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (citing 42 U.S. § 405(g)).  A reviewing court "may affirm only on the grounds that the Commissioner stated for [the] decision." *Copeland*, 771 F.3d at 923.

To be entitled to social security benefits, a claimant must show that he is disabled within the meaning of the Act.  *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A).  In evaluating a disability claim, the Commissioner has promulgated a five-step sequential process to determine whether: (1) the claimant is presently working; (2) the claimant

has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity. *See* 20 C.F.R. § 404.1520; *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. Once the claimant satisfies his or her initial burden, the burden shifts to the Commissioner at step five to show that there is other gainful employment in the national economy that claimant is capable of performing. *Greenspan*, 38 F.3d at 236. If the Commissioner shows that other jobs are available to the claimant, the burden of proof shifts back to the claimant to rebut such a finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

The ALJ has a duty to fully and fairly develop the facts relating to a claim for disability benefits. *See Ripley*, 67 F.3d at 557 (citing *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) (per curiam); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)). If the ALJ does not satisfy this duty, the resulting decision is not substantially justified. *See id.* However, the Court does not hold the ALJ to procedural perfection and will reverse the ALJ's decision as not supported by substantial evidence where the claimant shows that the ALJ failed to fulfill the duty to adequately develop the record only if that failure prejudiced Plaintiff, *see Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012) – that is, only if Plaintiff's substantial rights have been affected, *see Audler*, 501 F.3d at 448. Put another way, Plaintiff "must show that he could and would have adduced evidence that might have altered the result." *Brock v. Chater*, 84 F.3d 726, 728–29 (5th Cir. 1996).

### III.     DISCUSSION AND ANALYSIS

Plaintiff presents interrelated issues on appeal in support of his argument that the ALJ's RFC and disability determinations are not supported by substantial evidence.  Plaintiff argues that the ALJ (1) failed to properly evaluate the medical opinions of record, including the opinion of Plaintiff's treating psychiatrist, Dr. Brinkman, in determining Plaintiff's RFC; (2) failed to properly incorporate Plaintiff's mental impairments into the RFC determination; and (3) presented a deficient hypothetical question to the VE that did not incorporate Plaintiff's functional limitations.  The Court will consider each contention in turn.

A.  The ALJ properly evaluated the medical opinion evidence of record.

Plaintiff argues that the ALJ improperly evaluated the opinions of his treating psychiatrist, Dr. Brinkman when he assigned his opinions "little weight" and "no weight." Dkt. No. 14 at 8–9, 12.  Plaintiff further argues that the ALJ failed to consider Plaintiff's GAF scores as reported by MHMR.  *Id*. at 12–13.  As explained below, the undersigned finds that the ALJ did not err in his evaluation of the medical opinion evidence.

1.  The ALJ applied the proper legal standard in evaluating Dr. Brinkman's opinion.

Plaintiff submits that the ALJ erred when he assigned Dr. Brinkman's opinion "little weight" without applying the six-factor analysis prescribed by 20 C.F.R. § 404.1527.  Dkt. No. 14 at 9–10.  The Commissioner responds that the ALJ properly evaluated Dr. Brinkman's opinion and dismissed Dr. Brinkman's "pessimistic medical statement" for good cause as inconsistent with his own treatment notes.  Dkt. No. 15 at 6.  The undersigned finds that the ALJ properly evaluated Dr. Brinkman's opinions and was entitled to assign them less than controlling weight.

Generally, "[t]he opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining

disability." *Newton v. Apfel*, 209 F.3d 448, 445 (5th Cir. 2000); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[6] "Where the ALJ rejects the opinion of the treating physician, the [Fifth Circuit has] held that, 'absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § [404.1527(c)].'" *Qualls v. Astrue*, 339 F. App'x 461, 465 (5th Cir. 2009) (quoting *Newton*, 209 F.3d at 453). These factors include: (1) the physician's length of treatment of the claimant and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the support of the physician's opinion afforded by the medical evidence of record; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the treating physician; and (6) any other relevant factors. 20 C.F.R. § 404.1527(c)(2)–(6).

The opinions of treating physicians, however, are not conclusive, and the ALJ must decide the claimant's disability status. *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001) (citing *Greenspan*, 38 F.3d at 237). "'Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.'" *Qualls*, 339 F. App'x at 465 (quoting *Newton*, 209 F.3d at 455–56). Upon a showing of good cause, the ALJ is "free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Barrance v. Colvin*, No. 3:12-CV-71-BN, 2013 WL 1842286, at *3 (N.D. Tex. May 2, 2013) (citing *Newton*, 209 F.3d at 455–56).

---

[6] For claims filed before March 27, 2017, the rules provided by 20 C.F.R. §§ 404.1527, 416.927 apply with respect to the evaluation of medical opinion evidence. Plaintiff filed his application for disability and disability benefits on December 8, 2015. Therefore, these statutory provisions govern. *See generally* 20 C.F.R. § 404.164(a) (determining when an application is deemed filed under SSA rules).

Courts in the Northern District of Texas have since held that "*Newton* requires only that the ALJ 'consider' each of the [§ 404.1527(c)] factors and articulate good reasons for its decision to accept or reject the treating physician's opinion." *Jeffcoat v. Astrue*, No. 4:08-CV-672-A, 2010 WL 1685825, at *3 (N.D. Tex. April 23, 2010). "The ALJ need not recite each factor as a litany in every case." *Id.* at *3 (quoting *Emery v. Astrue*, No. 7:07-CV-084-BD, 2008 WL 4279388, at *5 (N.D. Tex. Sept. 17, 2008)).

Although he did not sequentially examine each § 404.1527(c) factor, the ALJ's narrative discussion and reasoning reflects that he implicitly considered and adequately applied each factor before discounting Dr. Brinkman's opinion, assuming such an analysis was necessary. The ALJ, at the outset, stated that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p," and that he "also considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527." Tr. 19.

In his discussion, the ALJ summarized the treatment notes prepared by Dr. Brinkman between August 2015 and December 2016. Tr. 21. Dr. Brinkman performed an initial neuropsychological evaluation of Plaintiff on August 10, 2015. Tr. 22. This initial evaluation revealed Plaintiff had "excellent intellectual functioning" with normal processing skills, perceptual-motor skills, and executive functioning. Tr. 348. However, Dr. Brinkman opined that "marked disruptions to attention systems and severe levels of depression and anxiety" adversely affected Plaintiff's daily activity. Tr. 22, 348. As previously stated, Dr. Brinkman observed that Plaintiff maintained flat affect with a depressed mood, displayed minimal eye contact, and was fidgety throughout the initial evaluation, but he also noted that Plaintiff had normal recent and remote memory, speech, and thought process, with good judgment and insight. Tr. 351. Dr.

Brinkman's initial evaluation diagnosed Plaintiff with severe levels of depression and anxiety, along with a great deal of cognitive disorganization resulting in distractibility, difficulty maintaining train of thought, and at times poor judgment.  Tr. 308–09.

The ALJ acknowledged Plaintiff's continued treatment with Dr. Brinkman, which occurred on approximately a monthly basis. Tr. 22.  Dr. Brinkman observed that Plaintiff appeared more anxious and depressed in November 2015.  Tr. 303 (Dr. Brinkman's treatment note that Plaintiff's depression was "becoming more prominent" and that Plaintiff appeared more anxious); Tr. 302 (On November 30, 2015, Plaintiff reported that "nothing has changed in his life.").  A month later, in December 2015, Plaintiff reported that he felt "not very focused and efficient," and that he plans his activities around whether he has Adderall available.  Tr. 22, 339.

In January 2016, Dr. Brinkman prescribed Plaintiff a one-month trial of Adderall contingent on the condition that Plaintiff would get out of bed and be dressed by a certain time each day.  Tr. 22; Tr. 336–337 (In addition to Adderall, Dr. Brinkman prescribed Plaintiff Vyvanse).  A few months later, in March 2016, Dr. Brinkman observed that Plaintiff was taking Vyvanse as prescribed and had "improved significantly."  Tr. 22, 336.  Dr. Brinkman's treatment notes indicated that Plaintiff's affect "was brighter and more talkative, with better organization of his thoughts," and that Plaintiff reported having more energy.  Tr. 336.  In April 2016, Dr. Brinkman observed that Plaintiff had emotional improvement while taking Vyvanse, but that he displayed little improvement in his initiative.  Tr. 22, 335.

On May 24, 2016, Dr. Brinkman completed a medical source statement in which he found Plaintiff to be markedly impaired or extremely impaired in several functional areas.  Tr. 313–315. Additionally, Dr. Brinkman decided to increase Plaintiff's Vyvanse dosage after Plaintiff became "very angry" when family members attempted to discuss difficult issues with him.  Tr. 23.  The

ALJ explained that Dr. Brinkman's treatment notes in September, October, and November of 2016 stated that, while taking Vyvanse, Plaintiff "was more focused, organized[,] and depression appeared to be managed well." *Id.* Finally, in December 2016, Dr. Brinkman observed that Plaintiff reported becoming very angry with his mother regarding a comment she made about the Social Security Disability process. *Id.* Plaintiff discontinued his treatment with Dr. Brinkman at the end of December 2016 because of insurance policy costs. *Id.*

The ALJ concluded that Dr. Brinkman's opinion that Plaintiff had several marked and extreme limitations deserved little weight as being inconsistent with Dr. Brinkman's own medical records. *Id.* The ALJ also found that the medical treatment records from MHMR contradicted Dr. Brinkman's opinion and did not support the extreme nature of his findings. These medical treatment records include statements made by Plaintiff, showing that he "display[ed] an interest in the NFL draft" and was "able to work at his mom's driving range, with a euthymic mood and affect, enjoying television, all when taking his medication as prescribed and under proper medical management." Tr. 24, 620. Although the treatment records from MHMR provide no opinion as to the effects of Plaintiff's mental impairments on his ability to work, the medical staff note that Plaintiff's depression and anxiety seemingly became reduced and manageable when he adhered to his medical regimen. Tr. 23, 649. These treatment records serve as evidence to discount Dr. Brinkman's opinion.

The opinions of the SAMCs, which the ALJ assigned "some weight" in his discussion, serve as additional evidence to discount Dr. Brinkman's opinions. With respect to those opinions, both Dr. Schade and Dr. Donovan examined the medical evidence and concluded that Plaintiff's symptoms do not wholly comprise his ability to function, and that Plaintiff, at most, was moderately limited under the "paragraph B" criteria. Tr. 64 (Dr. Schade's disability statement on

initial consideration); Tr. 78 (Dr. Donovan, on reconsideration, affirming findings as written).  The SAMCS concluded Plaintiff had the RFC to understand, remember, and carry out detailed instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes.  Tr. 67, 78.  The ALJ recognized these limitations to the extent they were consistent with his RFC findings, assigning them "some weight" as "generally consistent" with the medical evidence because the ALJ ultimately found Plaintiff to be more limited than the SAMCs suggested based on Plaintiff's testimony and MHMR treatment records.  Tr. 23.

The ALJ's discussion of  Dr. Brinkman's treating relationship with Plaintiff, along with Dr. Brinkman's opinion and the supporting and contradicting evidence, demonstrates that the ALJ properly (albeit implicitly) considered the six-factors prescribed by § 404.1527(c).  Therefore, the ALJ's evaluation of Dr. Brinkman's opinion satisfied both the Social Security regulations and *Newton*.  *See* 20 C.F.R. § 404.1527(c) (regulations require that the ALJ "apply" the factors and articulate good reasons for the weight assigned to the treating source opinion).

Factors one and two require the ALJ to consider the length, nature, and extent of the treating relationship, as well as the frequency of the examinations.  In this regard, the ALJ's discussion noted that Dr. Brinkman treated Plaintiff between August 2015 and December 2016.  Tr. 22.  The ALJ explicitly noted that Plaintiff received psychotherapy from Dr. Brinkman approximately once a month from September 2015 to December 2015, and that Plaintiff continued treatment with Dr. Brinkman throughout the following year, which included continued meetings with Dr. Brinkman and, at times, prescriptions for Adderall and Vyvanse.  Tr. 22–24.  Factor five calls for consideration of the specialization of the treating source, which the ALJ also recognized by identifying Dr. Brinkman as a neuropsychologist and referring to him as  "Dr. Brinkman, Ph.D." Tr. 27.

Factors three, four, and six require the ALJ to evaluate the supportability and consistency of the treating source's opinion, as well as other factors that tend to support or contradict the opinion, such as other medical evidence within the record. Here, the record reflects that the ALJ found Dr. Brinkman's opinion that Plaintiff had mostly extreme and marked limitations to be inconsistent with his own treatment notes that Plaintiff improved with medication, as well as the findings of the SAMCs, MHMR treatment records, and statements from Plaintiff. Tr. 23; Tr. 330 (Dr. Brinkman's observations that, while properly medicated, Plaintiff's affect was brighter and more talkative, with better organization of his thoughts); Tr. 41 (Plaintiff's testimony at the hearing indicating that medication helps); Tr. 620 (Dr. Pugh's notes that Plaintiff reported an interest in watching the NFL draft, that his medicine regimen partially helped his depressed mood, and that Plaintiff claims he is avoiding situations that could induce anxiety and panic attacks); Tr. 621–623 (Dr. Pugh observed Plaintiff's appearance to be casual but neat, with euthymic mood, congruent affect, and normal speech, noting that medicine reduces symptoms).

It is clear, on these facts, that the ALJ considered the regulatory factors and provided good reasons for assigning less than controlling weight to Dr. Brinkman's opinion. Therefore, the undersigned finds that the ALJ did not err.

2. The ALJ properly discounted Dr. Brinkman's letter regarding Listing 12.04.

Plaintiff also contends that the ALJ improperly assigned "no weight" to Dr. Brinkman's May 2016 opinion letter, which indicated that Plaintiff had at least four symptoms characteristic of depressive syndrome. Dkt. No. 14 at 12. The Commissioner takes the position that any opinion rendered by Dr. Brinkman that Plaintiff meets Listing 12.04 is entitled to "no weight" as an opinion that is reserved to the Commissioner. Dkt. No. 15 at 6. Moreover, the Commissioner argues that

check-the-box forms unaccompanied by further explanation are rightfully discounted. *Id*. The Court agrees with the Commissioner.

Treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance. 20 C.F.R. § 404.1527(d)(3). Under Social Security regulations, the ALJ is solely responsible for deciding whether a listing is met or equaled. SSR 96-6p, 1996 WL 374180, at *3. Whether a claimant's impairment meets the requirements of a listed impairment is usually more a question of medical fact than opinion because most of the requirements are objective and simply a matter of documentation, but nevertheless, it is still an issue ultimately reserved to the Commissioner. SSR 96-5P, 1996 WL 374183, at *3. Whether the impairment is equivalent in severity to the requirements of a listed impairment requires a judgment that the medical findings equal a level of severity that prevents a person from performing any gainful activity—an issue reserved to the Commissioner. *Id*. at *4.

Plaintiff disagrees with the ALJ's (and the Commissioner's) characterization of Dr. Brinkman's letter, arguing it does not serve as Dr. Brinkman's opinion that Plaintiff's mental impairments satisfy Listing 12.04, but rather "establishes that the Plaintiff has all of the required elements to satisfy the diagnosis of a depressive disorder as set forth in Section 12.04 of Appendix 1." Dkt. No. 16 at 7–8. Citing to the Ninth and Seventh Circuits, Plaintiff contends that the form of medical opinions does not automatically render them questionable when the opinion is supported by the evidence.[7] *Id*. at 8.

The problem with Plaintiff's argument is that the ALJ found Dr. Brinkman's opinion *not* to be consistent with the medical evidence for the reasons explained above. Under circumstances where checklists opinions are unsupported by or inconsistent with the medical records, the Fifth

---

[7] Plaintiff cites favorably to *Garrison v. Colvin*, 759 F.3d 995, 1014 n. 17 (9th Cir. 2014) and *Larson v. Astrue*, 615 F.3d 744, 750–751 (7th Cir. 2010).

Circuit held that such opinions are not entitled to considerable weight. *See Bradshaw v. Saul*, No. 4:18-CV-00947-P-BP, 2019 WL 7461703, at *6 (N.D. Tex. Dec. 12, 2019), *report and recommendation adopted*, 2020 WL 42283 (N.D. Tex. Jan. 2, 2020); *see also Foster v. Astrue*, 410 F. App'x. 831, 833 (5th Cir. 2011) ("[T]he 'questionnaire' format typifies 'brief or conclusory' testimony. . . . [W]e agree with the magistrate judge's conclusion that 'due to its brevity and conclusory nature, lack of explanatory notes, or supporting objective tests and examinations, [the treating physician's] opinion is given little weight.'"); *Rollins v. Astrue*, 464 F. App'x 353, 357 n. 5 (5th Cir. 2012) (finding that "check-the-box" forms without additional explanations may be given less weight but reserving the determination for the ALJ). Moreover, it is clear that the ALJ rejected this opinion on the basis that it was a question of law reserved for the Commissioner, not simply because he objected to the opinion's form. Tr. 24. (ALJ finding the opinion that a claimant meets a Listing is an opinion reserved to the Commissioner).

As for Plaintiff's contention that this opinion is consistent with the evidence and to the extent he disagrees with the weight assigned by the ALJ, he effectively asks this Court to reweigh the evidence, or at the very least second-guess the ALJ's assigned weight. This is not for the Court to do. *See Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988) (A court "may neither reweigh the evidence in the record nor substitute [its] judgment for the [Commissioner's]."). As a result, the undersigned finds that the ALJ did not err when he assigned "no weight" to Dr. Brinkman's opinion letter on this issue.

    3.  The ALJ properly considered Plaintiff's reported GAF scores.

Additionally, Plaintiff argues that the severity in the GAF scores reported by MHMR "is consistent with the opinion of Dr. Brinkman as to the severity and limiting effects of Plaintiff's impairments," and that "the ALJ's failure to give due consideration to the GAF scores reported by

[MHMR] represents a failure to consider medical opinion evidence." Dkt. No. 14 at 12–13. The Commissioner, in response, states that the ALJ recognized Plaintiff's low GAF scores, but "he had no obligation to ascribe special significance to such scores." Dkt. No. 15 at 7.

Federal regulations and Social Security Rulings require that an ALJ evaluate "every medical opinion of record," and this Court previously found that GAF scores "should be treated as opinion evidence." *Jackson v. Colvin*, No. 4:14-CV-756-A, 2015 WL 7681262, at *3–5, 10 (N.D. Tex. Nov. 25, 2015) (quoting 20 C.F.R. §§ 404.1527, 416.927). However, these regulations and rulings require that GAF scores, like other medical opinions, be supported by and not inconsistent with other substantial evidence within the record. 20 C.F.R. §§ 404.1527, 416.927; SSR 96-6p, 1996 WL 374180, at *1. Indeed, the SSA published internal guidance regarding the interpretation of GAF scores, providing that "[a]s with other opinion evidence, the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." *Jackson*, 2015 WL 7681262, at *3 (quoting SSA Administrative Message 13066 (effective July 22, 2013)).

In assessing Plaintiff's GAF scores in his narrative discussion, the ALJ stated the following:

> The claimant has GAF scores ranging from 60-65 (1F, 2F, 8F, 10F). As opinion evidence, the GAF scores are of limited evidentiary value as they reveal only snapshots of impaired and improved behavior. Instead, the undersigned finds the treatment records more probative as they demonstrate the claimant's good response to medication and immediate increase in GAF scores, once stabilized on medication (1F, 2F, 8F and 10F)

Tr. 24. Despite Plaintiff's assertions to the contrary, it is clear from the decision that the ALJ did consider the GAF scores reported by MHMR, as well other reported GAF scores. The ALJ's

narrative discussion considered medical treatment records associated with Plaintiff's hospitalizations in 2011 and 2015.  Tr. 21.

In 2011, Plaintiff reported an increase in depression due to the increased stresses of a new baby and losing his job, as well as a recent change in medication.  *Id*.  The ALJ noted that, on discharge, Plaintiff's GAF increased from 35 to 75, which suggested that Plaintiff's "increase in depression and suicidal ideation was situational and/or related to his recent medication change." Tr. 21, 23; *see also* Tr. 253, 263 (GAF scores reported by Acadia of Abilene in 2011).

In 2015, upon his admission to River Crest Hospital for suicidal ideation, Plaintiff reported increased stress from a finalized divorce and noted he had been unable to take his prescribed medicine for several months.  Tr. 21.  The medical treatment records from River Crest Hospital indicated that Plaintiff's mood gradually improved after restarting his medication, and that his GAF score increased from 20 to 65 upon discharge.  *Id*.  The ALJ noted that "this hospital admission shows the claimant's decline in anxiety related to situational stressors and failure to take his medication as prescribed."  *Id.*; *see also* Tr. 269 (River Crest Hospital in 2015 reported Plaintiff's GAF scores was 20 on admittance, but 65 on discharge).

The ALJ's decision also expressly noted the GAF scores reported by MHMR.  Tr. 590 (Dr. Pugh at MHMR in January 2017 assessing Plaintiff's GAF at 48); Tr. 608 (March 23, 2017, finding no change in Plaintiff's GAF score).  Although the ALJ considered Plaintiff's low GAF scores, he found Plaintiff's hospitalizations records, Dr. Brinkman's treatment notes, and treatment records from MHMR to be of more probative value than the reported GAF scores because they showed stabilization and a good response when properly medicated.  Tr. 21, 23–24.  Therefore, the undersigned finds that the ALJ sufficiently considered Plaintiff's GAF scores. *Compare Jackson*, 2015 WL 7681262, at *3 (holding that the ALJ properly evaluated the claimant's GAF scores, "as

he reported them throughout his decision" and found such scores were inconsistent with the actual treatment records, which indicated a positive response to treatment despite the little improvement reflected in the treating physician's GAF scores) *with Ayala v. Saul*, 7:19-CV-00024-O-BP, 2020 WL 2487051, Feb. 14, 2020, *adopted in part and rejected in part*, 2020 WL 1226879, at *3–4 (N.D. Tex. Mar. 13, 2020) (the Court found that the ALJ erred when he failed to mention Plaintiff's GAF scores in his decision and did not explain his rejection of the GAF scores).

In sum, the undersigned concludes that the ALJ properly considered and evaluated Plaintiff's GAF scores reported by MHMR. And, even if the ALJ erred in his consideration of Plaintiff's GAF scores, such error is harmless because, as explained below, there is other evidence in the record that substantially supports the ALJ's RFC and disability determinations. *See Perez v. Astrue*, No. 6:07-CV-0014-BI, 2008 WL 4108130, at *8 (N.D. Tex. Sept. 5, 2008) (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("[W]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.")).

B. The ALJ's RFC determination is supported by substantial evidence.

Plaintiff challenges the ALJ's RFC determination, arguing that the ALJ (1) determined Plaintiff's RFC by improperly substituting his own opinion for the medical opinions of record and (2) failed to incorporate Plaintiff's functional limitations into the RFC determination. Dkt. No. 14 at 12–17; Dkt. No. 16 at 2–6.

An individual's RFC is defined as the most an individual can do despite his limitations or restrictions. *See* 20 C.F.R. § 404.1545(a)(1). An individual's RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1, 3–5 (S.S.A. July 1, 1996).

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including functions in paragraphs (b), (c), and (d) of 20 C.F.R. [§§] 404.1545 and 416.945." *Id*. at *1. Paragraphs (b), (c), and (d) relate to physical, mental, and other abilities. When assessing mental impairments, the ALJ considers evidence of the claimant's abilities to understand, remember, and carry out instructions, as well as respond appropriately to supervision, co-workers, and pressures in a work setting. 20 C.F.R. § 404.1545(c). The ALJ uses the "paragraph B criteria" to rate the severity of the claimant's mental limitations in the following functional areas: (1) understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id*. § 404.1520a(c)(3); *see id*. Part 404, Subpart P, Appendix 1. Additionally, the ALJ considers limitations and restrictions that affect other work-related abilities. 20 C.F.R. § 404.1545(d).

The ALJ's RFC assessment is based upon "*all* of the relevant evidence in the case record," including, but not limited to, "medical history, medical signs, and laboratory findings; the effects of treatment; and reports of daily activities, lay evidence, recorded observations, and work evaluations." *Eastham v. Comm'r of Soc. Sec. Admin.*, No. 3:10-CV-2001-L, 2012 WL 691893, at *6 (N.D. Tex. Feb. 17, 2012) (citing SSR 96-8p). The RFC determination falls solely to the ALJ, who is responsible for resolving any conflicts in the evidence. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (per curiam). "The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record." *Ewing v. Colvin*, No. 4:13-CV-085-A, 2014 WL 2464765, at *4 (N.D. Tex. June 2, 2014) (citing *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991)). Likewise, the ALJ is not required to expressly state in the RFC the limitations on which it is based. *Cornejo v. Colvin*, No. EP-11-CV-470-RFC, 2013 WL 2539710, at *9 (W.D.

Tex. June 7, 2013) (citing *Bordelon v. Astrue*, 281 F. App'x 418, 422–23 (5th Cir. 2008) (per curiam)). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. However, the ALJ must rely on medical opinions in the record in order for his RFC determination to be supported by substantial evidence. *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) (citing *Ripley*, 67 F.3d at 557).

    1. The ALJ did not commit a *Ripley* error when evaluating opinion evidence.

Plaintiff argues that the ALJ, in making his RFC determination, rejected not only Dr. Brinkman's opinions, but all other medical opinions of record, and instead relied on his own unsupported medical opinion to determine Plaintiff's RFC. As a result, Plaintiff argues, the ALJ's RFC determination is not supported by substantial evidence and violates the dictates of *Ripley v. Chater*. Dkt. No. 14 at 12; Dkt. No. 16 at 3–4.

The Commissioner responds that what "Plaintiff characterizes as the ALJ substituting his opinion is actually the ALJ properly interpreting the medical evidence to determine Plaintiff's capacity for work." Dkt. No. 15 at 8. After a review of the record, the undersigned finds that the ALJ did not commit a *Ripley* error in the instant case.

In *Ripley*, the Fifth Circuit found that remand for additional administrative proceedings was necessary where the "record includes a vast amount of medical evidence establishing that [the claimant] has a problem with his back" but "does not clearly establish . . . the effect claimant's condition had on his ability to work." 67 F.3d at 557. The Fifth Circuit reemphasized the holding in *Ripley* that "an ALJ may not—without opinions from medical experts—derive the applicant's [RFC] based solely on the evidence [of the claimant's] claimed medical conditions. Thus, an ALJ

may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions." *Williams*, 355 F. App'x at 832 n. 6 (citing *Ripley*, 67 F.3d at 557).

Plaintiff argues that the ALJ's RFC finding that he can perform simple, routine work and make simple work-related decisions is not reflected in the opinion of Dr. Brinkman, the SAMCs, or any other medical opinion of record.  Dkt. No. 14 at 12.  Unlike *Ripley*, this case contains evidence from multiple sources establishing the effect of Plaintiff's mental impairments on his ability to perform work-related activities.  As stated above, the ALJ, for good cause, rejected Dr. Brinkman's opinion after performing the detailed six-factor analysis prescribed by 20 C.F.R. § 404.1527(c).  Contrary to Plaintiff's assertions, however, the ALJ did not reject the opinions of the SAMCs.  Dr. Schade evaluated Plaintiff's medical records on initial consideration, and concluded Plaintiff had the RFC to understand, remember, and carry out detailed instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes. Tr. 67.  Dr. Donovan affirmed Dr. Schade's determination as written.  Tr. 76.  The ALJ and SAMCs both conducted a function-by-function analysis and determined that Plaintiff demonstrated no more than moderate limitations in the functional areas examined under the "paragraph B" criteria. Tr. 19, 65–66, 77–78.  Indeed, in certain areas, the SAMCs opined that Plaintiff had no limitation at all.  Tr. 65–66, 77–78.  The ALJ specifically noted at step three that neither SAMC concluded that Plaintiff's recognized mental impairments met a listing.  Tr. 19.

In considering those opinions, the ALJ assigned them "some weight" as "generally consistent with the evidence," but included additional limitations in his RFC assessment based on Plaintiff's testimony and MHMR treatment records—neither of which the SAMCs reviewed at the time of their determinations.  Tr. 61–62, 72–73.  The ALJ, in concluding that Plaintiff can perform simple, routine work involving simple work-related decisions, departed from the SAMCs' medical

opinions insofar as the ALJ found Plaintiff to be more limited than the SAMCs opined. However, this departure does not constitute a rejection of those opinions, as Plaintiff suggests.

This Court has held that the inclusion of additional limitations on a claimant's activity than those opined by the SAMCs is not reversible error. *See Martin v. Colvin*, No. 3:14-CV-3319-BK, 2015 WL 2114506, at *6 (N.D. Tex. May 5, 2015) (finding no reversible error when the ALJ permissibly relied on the SAMC's function-by-function assessment regarding Plaintiff's abilities, but then found additional limitations); *Asher v. Colvin*, No. 4:12-CV-831-A, 2014 WL 888350, at *12 (N.D. Tex. March 6, 2014) (same); *Michael L. v. Berryhill*, No. 3:18-CV-0010-G-BK, 2019 WL 1243866, at *5 (N.D. Tex. Feb. 20, 2019) (same). *But see, e.g.*, *Thornhill v. Colvin*, No. 3:14-CV-335-M, 2015 WL 232844, at *10 (N.D. Tex. Dec. 15, 2014) (explaining that an ALJ cannot "independently decide the effects of Plaintiff's mental impairments on her ability to perform work-related activities . . . even if the ALJ believes he is simply giving Plaintiff the benefit of the doubt as to what limitations might apply."), *report and recommendation adopted*, 2015 WL 232844 (N.D. Tex. Jan. 16, 2015).

Plaintiff's argument that the ALJ rejected the opinions of the SAMCS simply because the RFC determination differed from their conclusions does not establish reversible error. The ALJ did not wholly reject the SAMCs' assessments, and he explained the reasoning for his decision. Rather, the ALJ properly evaluated the medical opinion evidence of record and did not commit a *Ripley* error. *See Ripley*, 67 F.3d at 557. Therefore, the undersigned finds no reversible error on this point.

## 2. The ALJ's RFC determination is supported by substantial evidence.

Plaintiff contends that the ALJ failed to incorporate the mental limitations he found in the psychiatric review technique into his RFC assessment, and that Plaintiff's RFC determination is

not supported by substantial evidence.  In his response, the Commissioner acknowledged that "the ALJ's residual functional capacity assessment does not directly correspond to the opinion of any particular physician of record[,]" but nevertheless maintains that "the ALJ is entitled to weigh all of the available evidence and render a residual functional capacity determination that is consistent with the record as a whole, as he did here."  Dkt. No. 15 at 8.  Upon a review of the pleadings, briefs, administrative record, and applicable legal standards, the undersigned finds that the ALJ's RFC determination is supported by substantial evidence.

In making an RFC determination, the ALJ must perform a function-by-function assessment of the claimant's ability to perform sustained work-related physical and mental activities "based upon all of the relevant evidence" and considering "both exertional and nonexertional factors." *Myers*, 238 F.3d at 620 (citing SSR 96-8P, 1996 WL 374184, at *3–6).  The record reflects that the ALJ identified Plaintiff's mental limitations and assessed his work-related abilities on a function-by-function basis.  Tr. 19.  The ALJ also considered medical records associated with Plaintiff's hospitalizations, treatment records from MHMR, the opinion of Dr. Brinkman (although he rejected it), and the opinions of the SAMCs.

In his narrative discussion, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical and other evidence." *Id*. The ALJ considered Plaintiff's testimony about his daily activities; the nature, location, duration, frequency, and intensity of Plaintiff's alleged symptoms; the effectiveness of medicine in managing Plaintiff's symptoms, including any related side effects; Plaintiff's work history; and the functional limitations that stem from Plaintiff's impairments.  Tr. 20.  The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the symptoms alleged by Plaintiff, however, the ALJ further determined that Plaintiff's

statements about the intensity, persistence, and limiting effects of his symptoms were "not consistent with the medical evidence and other evidence in the record." Tr. 20. Ultimately, the ALJ concluded that the "totality of the evidence" suggests Plaintiff's symptoms were "not as severe as he alleged" *Id*.

Plaintiff does not challenge the ALJ's "paragraph B" findings at step three. Instead, he argues that the ALJ's RFC determination failed to accommodate his moderate limitation in his ability to adapt or manage himself and his ability to concentrate, persist, or maintain pace. Dkt. No. 14 at 15–17. The undersigned will separately consider each argument.

a. *Moderate limitation in adapting or managing oneself*

Plaintiff argues that "nothing in the ALJ's RFC determination appears to include accommodations for Plaintiff's inability to manage his psychologically based symptoms, adapt to changes, or respond to the normal demands of employers (and customers) in a work setting." Dkt. No. 14 at 16. Plaintiff contends that this error rendered a deficient RFC determination that is not supported by substantial evidence. After a review of the record, the undersigned disagrees.

In finding Plaintiff to be moderately limited in his ability to adapt and manage himself under the "paragraph B" criteria, the ALJ noted that Plaintiff's function report dated January 2016 indicated he was able to maintain personal hygiene, prepare simple meals, and perform household chores. Tr. 18, 206–214.

Plaintiff argues that maintaining personal hygiene is only one factor, and that the RFC determination fails to account for Plaintiff's hearing testimony that he "has significant difficulty managing his psychologically based symptoms in a work setting and responding to the normal demands the work place." Dkt. No. 14 at 15. With respect to Plaintiff's hospitalizations in 2011 and 2015, the ALJ observed a connection between Plaintiff's hospitalization for suicidal ideation

and his inability or failure to take medication as prescribed, indicating that Plaintiff was unable to respond to situational stressors when not properly medicated. Tr. 21. Additionally, the record reflects that the ALJ considered Plaintiff's testimony about his difficulties managing his symptoms and found it to be not entirely consistent with the medical evidence in the record, particularly the medical records suggesting that Plaintiff responded well when taking his medication as prescribed and under proper medical management. Tr. 23; Tr. 580 (Plaintiff reported medication compliance and that his medications were helpful to control his depression.); Tr. 620 (Plaintiff reporting that his medicine is at least partially helping his depressed mood, with a licensed vocational nurse noting that Plaintiff's anxiety and panic seem to be reduced without the constant use of stimulant drugs). The ALJ also pointed to MHMR treatment records that showed Plaintiff's mental status examination revealed no abnormalities. Tr. 23, 622. These medical treatment records, on which the ALJ relies, speak to Plaintiff's ability to manage his psychologically based symptoms, which indicate Plaintiff's symptoms are mitigated when taking his medication as instructed.

The record also demonstrates that the ALJ accounted for Plaintiff's difficulty in responding to the demands of employers and customers. In finding Plaintiff able to "occasionally respond appropriately to supervisors or coworkers, but never the public," the ALJ limited Plaintiff's social interaction within a work setting such that he would never be placed in a position to respond to customer's demands and only occasionally the demands of supervisors or co-workers. Tr. 24. This limitation similarly accounts for Plaintiff's marked limitation in interacting with others.

Additionally, the ALJ relied on the SAMCs' disability determination explanations, which included a function-by-function analysis and RFC assessment. Tr. 67, 78. Each SAMC found that the medical evidence "does not wholly support the alleged severity [and] limiting effects" alleged by Plaintiff, and concluded that Plaintiff was able to respond to changes in the workplace.

Tr. 67, 78.  Because the ALJ based his RFC assessment, at least in part, on a state medical examiner's report containing a function-by-function analysis, Plaintiff's RFC determination is "supported by substantial evidence and satisfies the standards announced in *Myers*" and SSR 96-8p.  *See Jodie C. v. Berryhill*, No. 3:18-CV-1687-S-BH, 2019 WL 3101689, at *18 (N.D. Tex. May 7, 2019) (quoting *Beck v. Barnhart*, 205 F. App'x 207, 213–214 (5th Cir. 2006)).

Moreover, with respect to translating functional limitations into the RFC determination, the ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record."  *See Muse*, 925 F.2d at 790.  "While the regulations require the ALJ to evaluate[] the limitations imposed by Plaintiff's mental impairments in certain areas and direct the ALJ to proceed to the RFC determination if Plaintiff's impairments are found severe, the regulations do not specifically require the ALJ to find that the limitations found in evaluating the mental impairment must be word-for-word incorporated into . . . the RFC determination." *Patterson v. Astrue*, No. 1:08–CV–109–C, 2009 WL 3110205, at *5 (N.D. Tex. Sept. 29, 2009).  Here, the ALJ explained his reasoning and incorporated the limitations he recognized into the RFC determination.

b.  *Moderate limitation in concentration, persistence, or pace*

In determining that Plaintiff had a moderate limitation in his ability to concentrate, persist, or maintain pace, the ALJ acknowledged Plaintiff's claims regarding his difficulties in paying attention, handling change, and finishing tasks.  Tr. 18.  The ALJ found Plaintiff was only moderately limited in this functional area based on statements from Plaintiff and corroborating evidence that he remained able to watch television daily, concentrate during his mental health examinations, and drive short distances to medical appointments.  Tr. 23.

The crux of Plaintiff's argument on this point is that the ALJ erred in finding Plaintiff able to perform simple, routine work and make simple work-related decisions because such a finding

fails to properly accommodate Plaintiff's moderate limitation in concentration, persistence, or pace. In support of this contention, Plaintiff cites several out-of-circuit cases that concluded simple, routine tasks and simple work-related decisions fail to adequately accommodate a moderate limitation in this functional area. Plaintiff's argument here is unavailing, as several district courts within the Fifth Circuit have found that simple, routine tasks and simple work-related decisions properly accommodate a moderate limitation in concentration, persistence, or pace. *See*, *e.g.*, *Smith v. Colvin*, No. 3:13-CV-1884, 2014 WL 1407437, at *4 (N.D. Tex. March 24, 2014) (finding that an RFC limiting claimant to simple work "reasonably incorporates a moderate . . . limitation in concentration, persistence, or pace); *Dunson v. Berryhill*, No. 7:17-CV-0001-BP, 2018 WL 1427107, at *6 (N.D. Tex. Mar. 22, 2018) (restricting claimant to "simple tasks" adequately incorporated moderate limitation in concentration, persistence, and pace); *see also Bordelon*, 281 F. App'x at 422–23 (ALJ did not commit reversible error when his RFC assessment and hypothetical "reasonably incorporated" the claimant's moderate limitation in concentrating, persistence, and pace by restricting him to "rare public interaction, low stress, and simple, one-to-two step instructions.").

Citing within the Fifth Circuit, Plaintiff relies on *Fitzpatrick v. Colvin*, No. 3:15-CV-3202-D, 2016 WL 1258477 (N.D. Tex. Mar. 31, 2016). However, *Fitzpatrick* is distinguishable from the instant case and does not help Plaintiff here. In *Fitzpatrick*, this Court found the ALJ's RFC determination, as a whole, was not supported by substantial evidence when the ALJ rejected all medical opinions of record and independently determined that the plaintiff could perform simple work despite having, among other things, moderate limitations in concentration, persistence, and pace. *Id.* at *8. Where the Court in *Fitzpatrick* found the ALJ committed a *Ripley* error, the undersigned previously determined that no such error occurred here. As stated above, the ALJ did

not reject the opinions of the state agency medical consultants, who, like the ALJ, concluded Plaintiff to be moderately limited in his ability to maintain attention and concentrate.

In any event, the ALJ pointed to objective medical evidence in support of his findings.  In determining that Plaintiff had a moderate limitation in concentration, persistence, or pace, the ALJ acknowledged Plaintiff's claims regarding his difficulties in paying attention, handling change, and finishing tasks; however, the ALJ found Plaintiff had only a moderate limitation in this functional area based statements Plaintiff's statements and corroborating evidence that he remained able to watch television daily, concentrate during his mental health examinations, and drive short distances.  Tr. 23.  Additionally, the ALJ cited to the medical treatment notes from MHMR in support of his determination that Plaintiff was "able to concentrate, exercise good judgment and insight, and interact appropriately with his medical health care providers."  Tr. 21; Tr. 649. (A licensed vocational nurse noted Plaintiff appeared anxious, but had no issues in attention, concentration, judgement, or insight. Plaintiff's mental examination indicated no abnormalities, and he reported to Dr. Pugh that he had an interest in watching television and the NFL draft).

Plaintiff acknowledged in his briefing that Dr. Brinkman's treatment notes established improvement in his condition when properly medicated, but he points to evaluations from MHMR where Plaintiff continued to report symptoms of depressed mood, difficulty in attention and concentration, poor focus, and difficulty completing tasks.  Dkt. No. 14 at 11.  This does not satisfy Plaintiff's burden, which requires that he demonstrate that no substantial evidence exists to support the ALJ's decision.  The ALJ's decision here is not subject to reversal because, even though there may be substantial evidence in the record that would support the opposite conclusion, substantial

evidence also supports the conclusion reached by the ALJ.  *See Dollis v. Astrue*, No. 4:08-CV-00503-A, 2009 WL 1542466, at *5 (N.D. Tex. June 2, 2009).

The ALJ concluded that the clinical findings and medical evidence of record did not substantiate the contention that Plaintiff's functional limitations exceed those determined by the ALJ in making his RFC assessment, and for the reasons discussed above, the undersigned finds substantial evidence supports that conclusion.

C.  The ALJ's hypothetical question to the VE was not defective.

Finally, Plaintiff argues that the ALJ posed a defective hypothetical question to the VE because the hypothetical failed to include the mental limitations recognized by the ALJ in his evaluation of the "paragraph B" criteria.  Dkt. No. 14 at 17–18; Dkt. No. 16 at 9.

The Commissioner takes the position that the ALJ presented hypothetical questions to the VE that reasonably included elements of his RFC finding, and therefore, the Commissioner argues that "the ALJ properly relied on the vocational expert's testimony to deny Plaintiff's claim at step four."  Dkt. No. 16 at 9.  The Commissioner also contends that Plaintiff failed to rebut the ALJ's step five determination that other jobs are available to Plaintiff in the national economy.  *Id*. at 10. The undersigned agrees with the Commissioner.

The claimant bears the burden of proof on the first four steps, and then the burden shifts to the Commissioner on the fifth step to show that the claimant can perform other substantial work in the national economy.  *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  Once the Commissioner makes this showing at step five, the burden shifts back to the claimant.  *Newton*, 209 F.3d at 453.  To establish that work exists for a claimant at steps four and five of the sequential disability determination process, the ALJ may rely on the testimony of a VE in response to a hypothetical question.  *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).  Under the Fifth

Circuit's test established in *Bowling v. Shalala*, the hypothetical presented to the VE must reasonably incorporate all of the disabilities recognized by the ALJ's RFC assessment, and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Id*. at 436. If the ALJ's hypothetical fails to incorporate all such functional limitations, the ALJ's determination is not supported by substantial evidence. *Id.* However, as with the RFC determination, the ALJ is not required to incorporate limitations into the hypothetical questions that he did not find to be supported in the record. *See Morris v. Bowen,* 864 F.2d 333, 336 (5th Cir. 1988).

Relying on VE testimony at step four, the ALJ concluded that Plaintiff could perform his past relevant work as a shop helper. Tr. 57. Alternatively, the ALJ found at step five that Plaintiff could perform other available work, such as machine package sealer, floor waxer, and box vender. Tr. 57–58. The ALJ's hypothetical question to the VE was as follows:

> For the first hypothetical please assume a hypothetical individual of the Claimant's age, a younger individual, with a 12th grade education and with past jobs that you described. And further assume this individual is limited to the following non-exertional limitations. That the individual would be limited to performing simple, routine tasks. Limited to making simple work related decisions. Can have only occasional contact with supervisors and coworkers, and no contact with the public.

Tr. 57.

Plaintiff argues that the hypothetical question did not include any moderate limitation recognized by the ALJ, but instead merely presented the VE with a conclusion that "such individual, despite impairments which were not disclosed to the VE can, nevertheless, perform 'simple, routine tasks' and make 'simple work related decisions.'" Dkt. No. 14 at 19. Thus, Plaintiff claims the expertise of the VE was wasted. *Id*. The undersigned cannot agree with Plaintiff's characterization of the ALJ's hypothetical question.

As discussed above, substantial evidence supports the ALJ's RFC determination, including Plaintiff's subjective allegations about his symptoms and the extent to which the ALJ found those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence of the record. The ALJ incorporated into Plaintiff's RFC all the limitations that he recognized when he found that Plaintiff could perform simple, routine work, make simple work-related decisions, and could occasionally interact with supervisors and co-workers but never members of the public. Tr. 18. The hypothetical question likewise reasonably incorporated all of Plaintiff's mental limitations that the ALJ recognized in the RFC because the hypothetical question mirrored the ALJ's RFC determination exactly. *See* Tr. 18, 24–25 (ALJ decision); Tr. 57–59 (Transcript of oral hearing). Therefore, the ALJ's hypothetical question satisfies the first prong of the *Bowling* test.

Prong two of the *Bowling* test is also satisfied. Plaintiff was represented by counsel at the administrative hearing, but counsel offered no objection to the hypothetical question and elected not to cross-examine the VE. "If the claimant is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the [VE] any purported defects in the hypothetical questions, there is no reversible error." *Monroe v. Shalala*, 55 F.3d 633, 1995 WL 313965, at *7 (5th Cir. May 5, 1995).

As explained above, the ALJ did not commit reversible error because there is not a "significant discrepancy . . . between the limitations included in the hypothetical question posited to the VE and the limitations the ALJ found in his decision." *Hyder v. Saul*, No. 4:19-CV-00976-O-BP, 2020 WL 5511314, at *5 (N.D. Tex. Sept. 14, 2020) (quoting *Ellis v. Astrue*, No. 7:09-CV-70-O-BF, 2010 WL 3422872, at *5 (N.D. Tex. July 27, 2010)); *contra Benton ex rel. Benton v. Astrue*, No. 3:12-CV-0874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (finding error

where the Commissioner acknowledged a discrepancy in the RFC and hypothetical because the RFC was *more* restrictive than the hypothetical posed to the VE) (emphasis added).

For these reasons, the undersigned finds no reversible error.

## IV.  CONCLUSION

Accordingly, it is recommended that the decision of the Commissioner be AFFIRMED in all respects.  Because all parties have not consented to proceed before a United States Magistrate Judge, the undersigned directs the Clerk of Court to REASSIGN this case to Senior United States District Judge Sam R. Cummings in accordance with normal procedures.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the District Court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IT IS SO ORDERED this 19th day of October, 2020.

_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE